**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Lewis T. Babcock, Judge**

Civil Case No. 04-cv-00105-LTB-MJW

EAST WEST RESORT TRANSPORTATION, LLC, doing business as
COLORADO MOUNTAIN EXPRESS and/or
CME PREMIER and/or
PREMIER VIP TRANSPORTATION and/or
RESORT EXPRESS a/k/a
COLORADO MOUNTAIN EXPRESS, LLC

       Plaintiff,

v.

RON BINZ,
POLLY PAGE, and
CARL MILLER, in their official capacities as Commissioners of the Public Utilities Commission of
the State of Colorado;

       Defendants.

_____

**AMENDED MEMORANDUM OPINION AND ORDER**
_____

       Babcock, J.

       Plaintiff East West Resort Transportation ("CME") and defendants Ron Binz, Polly Page

and Carl Miller, Commissioners of the Public Utility Commission of Colorado, (defendants will be

referred to herein as "the Commission") filed cross-motions for summary judgment on CME's

claims that the Commission's efforts to regulate its rates are preempted by federal law and violate

the Commerce Clause, Article I, § 8 of the United States Constitution. For the reasons stated

below, CME's motion is GRANTED and the Commission's motion is DENIED.

## I.  BACKGROUND

       Defendants are Members of the Public Utility Commission of Colorado, established

pursuant to Col. Rev. Stat. § 40-2-101. The Commission has exclusive authority to regulate common carriers, as set forth in Col. Rev. Stat. § 40-10-101 *et. seq.*

Plaintiff CME is a motor-vehicle common-carrier of passengers, operating exclusively in Colorado, providing transportation to and from Denver International Airport ("DIA") and Eagle Airport; to and from various Colorado ski resorts. It holds a license from the Commission to operate intrastate transportation routes, and also holds federal certificates from the Interstate Commerce Commission ("ICC") and/or its successor entity, the Surface Transportation Board ("STB") to operate in interstate transportation. CME's authority to operate in intrastate transportation substantially duplicates its federal authority to operate interstate routes.

This action stems from an enforcement action by the Commission against CME. On October 1, 2003, the Commission issued Civil Penalty Notice ("CPAN") No. 28339 to CME, for charging and advertising rates to passengers different from those on file with the Commission on sixteen separate occasions, in violation of Col. Rev. Stat. § 40-10-117. The penalties for these violations totaled $6400. CME subsequently revised its filed rates to align it with its charged rates. However, CME refuses to pay the $6400 penalty, contending that the Commission lacks the authority to issue the penalty notice and to regulate CME on these routes.

On January 20, 2004 CME filed this complaint seeking declaratory judgment that the Commission lacks jurisdiction over CME's routes because its authority is pre-empted by federal law, and that the Commission's regulation of CME violated CME's constitutional rights under the commerce clause of the U.S. Constitution, pursuant to 42 U.S.C. § 1983. CME also seeks a permanent injunction barring the Commission from regulating CME, and seeks attorney fees and costs pursuant to 42 U.S.C. § 1988.

On September 24, 2004 CME petitioned the STB to institute an administrative proceeding to resolve the legal rights of the parties. This action was stayed pending the outcome of that administrative process. However, on January 30, 2007 the STB ruled that it lacked jurisdiction over this issue after all, and stated that the parties could pursue the matter under the administrative processes of the United States Department of Transportation ("DOT".) The STB also noted that this court retained jurisdiction over this case. The parties agreed that they did not wish to pursue this matter through administrative channels.  Before me now are cross motions for summary judgment, supported by the full administrative record before the STB, as stipulated by both parties.

## II.  STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Here, the parties agree that no material fact is in dispute. The issue is which party prevails on summary judgment.

## III.  DISCUSSION

Several issues are at the core of this dispute. First, the parties contest whether the routes operated by CME in Colorado are by law interstate, and therefore subject to federal regulation, or are intra-state, and subject to state regulation. This determination in turn rests on  whether the

3

nature of the service CME provides qualifies as "interstate" under federal law, whether the interstate service CME provides is substantial in relation to its intrastate service, and whether CME provides regular interstate service. Second, the parties dispute whether the Commission's enforcement action is preempted by federal law. Third, the parties dispute whether CME's claim is valid under § 1983. Fourth, the Commission argues that CME's claim does not satisfy the legal requirements for injunctive relief. Finally, the parties dispute whether CME, even if it prevails, may receive attorney fees.  I will address all of these issues.

A.      Does CME Operate Interstate Routes?

The factual and legal framework underlying this case is not in dispute. CME holds federal grants of authority from the ICC and the STB to operate transportation on interstate routes. It also has authority from the Commission to operate intrastate transportation routes. It is undisputed that the intrastate routes authorized by the Commission duplicate its federal authorization. CME's right to operate purely intrastate transportation under its federal authorization relies on 49 U.S.C. § 13902(b)(3), which allows carriers to offer purely intrastate transportation "if such intrastate transportation is to be provided on a route over which the carrier provides interstate transportation of passengers."

The ICC, and federal courts, have clarified the requirements for classifying purely intrastate transportation as interstate under § 13902(b)(3).  For intrastate routes to qualify as interstate, "it is not enough for the carrier merely to offer interstate transportation on the route over which it conducts intrastate service. The interstate service must be active. . . the intrastate service may not operate independently of the interstate service, but instead must be conducted as a part of existing interstate service. . . the required interstate transportation must be an actual,

regularly scheduled service, it must be *bona fide* and involve service in more than one State, and it must be substantial." *Funbus Systems, Inc. – Intrastate Operations – Petition for Declaratory Order,* 1988 Fed. Car. Cas. ¶37,536, Nos. MC-C-10917, MC-153325 (Sub-No.2), MC-C-10943, 1988 WL 225255 at *2 (Decided August 11, 1988). *See also Airporter of Colorado, Inc., v. I.C.C.,* 866 F.2d 1238, 1240-1241 (10th Cir. 1989)  Moreover, "the interstate traffic must be substantial *in relation* to the intrastate traffic in that same operation." *Id.* at 1241 (emphasis in original.)

The parties dispute CME's ability to satisfy several elements of the *Funbus* test. While the Commission concedes that CME's operations are "actual" and are part of its existing intrastate operations, it argues that CME's services are not regularly scheduled, lack a nexus to interstate transportation, and are not "substantial" in relation to their intrastate routes.

1.      Regularly Scheduled

There appears no dispute that the bulk of CME's service is scheduled service; it departs and arrives at particular pre-designated times. However, the Commission contends that because CME sometimes cancels routes where "there's no guests in either direction," CME's service is not "purely based on a reliable, chronological schedule," and accordingly is not "regularly" scheduled.

The Commission provides scant authority for its proposition that "regularly scheduled" must mean a "pure," "reliable, chronological" schedule. Citing *Eveready Freight Service, Inc. v. Public Utilities Comm'n,* 449 P.2d 642, 644 (Colo.1969), the Commission contends that "scheduled operations must entail the concept of a regular time schedule previously announced as to time of departure and arrival between definitely established points regardless of whether there

are passengers or freight to be carried..."   However, *Eveready* addressed a situation where the carrier conceded it did not run scheduled operations on a particular route, running them only "on request at that time" due to the paucity of need for that route. *Id.* at 643-644. These are not the facts here, where CME generally operates on a specific schedule, only failing to run its schedule when there are no passengers. I conclude that CME's operations meet this element of the *Funbus* test.

       2.      Nexus to Interstate Transportation

      The Commission contends that CME's intrastate transportation service is insufficiently related to interstate travel to qualify as interstate. In *United States v. Yellow Cab,* 332 U.S. 218, 67 S. Ct. 1560, 91 L. Ed. 2010 (1947), the Supreme Court held that taxicab service to and from Chicago railroad stations was "too unrelated to interstate commerce to constitute a part thereof," even where the passenger's overall journey was interstate in nature. *Id.* at 230.  The taxicabs have no "contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental." *Id.* at 231.

      The Supreme Court based this conclusion on an assessment of "practical considerations" and the "common understanding" that "a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in his city of destination." *Id.*  However, the court acknowledged that some kind of "special arrangement" could render the trip from the station to a home "a constituent part of the interstate movement."  *Id.* at 232. The Court offered no examples or descriptions of a special arrangement that would serve this purpose.

The core of this dispute is what constitutes a "special arrangement" within the doctrine of *Yellow Cab.* The Commission argues that an intrastate transportation service to or from an airport only qualifies as interstate where there is a common arrangement between the interstate carrier and the intrastate carrier, generally in the form of a contractual arrangement, or a passenger holding a single, through ticket covering both the interstate and intrastate portions of the journey. CME contends that a prearranged ticket for CME transportation from an airport to a ski resort provided via a third party (such as a travel agent, an internet travel service or the ski resort) as part of a vacation package is legally sufficient to render such service interstate, even if the package does not include an air travel or interstate component.

The Commission cites numerous cases in support of its position, but none deal directly with the issue at hand. In *Pennsylvania Public Utility Comm'n v. U.S.,* 812 F.2d 8 (D.C. Cir. 1987), the D.C. Circuit concluded that transportation of airline personnel during overnight stop-overs to and from hotels within a state was interstate because it was part of an overall interstate journey and the service was part of a contract with the airline. *Id.* at 11. Significantly, the court rejected the contention that *Yellow Cab* defined through tickets as a requirement for interstate transportation, stating instead that *Yellow Cab* "suggests that a variety of the factors bearing on the character of the transportation" are relevant to determining if transportation is interstate. *Id.* at 10-11.

While the facts of the case did not implicate third party arrangements for a package tour, the *Pennsylvania Public Utility Comm'n* court discussed earlier ICC decisions distinguishing interstate and intrastate transportation, and cited an earlier ICC decision, *Kimball-Petition for Declaratory Order,* 131 M.C.C. 908 (1980), for the proposition that third party package deals

7

are insufficient to constitute a "common arrangement" between the airline and the intrastate carrier. 812 F. 2d at 12. However, *Kimball* interpreted incidental to air authority under 49 U.S.C. § 13506(a)(8)(A), a statutory provision different from the authority on which CME relies here. *Kimball,* 131 M.C.C. at 911. Incidental to air authority applies to carriers who operate solely within a 25 mile radius of an airport. 49 C.F.R. § 372.117(a)(2). This authority on its face is inapplicable to CME's service to and from DIA, but the Commission contends that it applies to CME's Eagle Airport service, since these routes to nearby resorts are less than 25 miles. CME argues that its federal certificates provide approved routes on which it can operate to and from Eagle Airport under to § 13902(b)(3), and thus incident to air authority is irrelevant to its claims here. In support, CME cites an ICC statement in part of the *Funbus* litigation that the rules governing incidental to air authority "has no application" to the test for interstate commerce under approved routes, where the route "is part of a network of routes that extend outside the 25-mile exempt zone." *See Funbus Systems Inc. – Intrastate Operations– Petition for Declaratory Order,* 133 M.C.C. 406, 422 (Decided December 28, 1984). Accordingly, since *Pennsylvania Public Utility Comm'n* analyzed and applied ICC decisions interpreting incidental to air authority, its dicta regarding third party package deals is not persuasive here.

The ICC concluded in *Minnesota Department of Transportation – Petition for Declaratory Order –Operations of Rochester Limousine Service, Inc.,* No. MC-C-30225, 1995 WL 123850 at *4 n. 4 (March 24, 1995) that "transportation entirely within a single state, including from and to an airport, can be interstate commerce if certain characteristics are met" such as through ticketing or other common arrangements with a connecting interstate carrier. But this case also did not state that common arrangements or through tickets are the only ways to

8

confer interstate status, and did not consider third party arrangements. Similarly, in *Funbus,* 1988 WL 225255 at *5 n. 3, the ICC stated that through ticketing or other common arrangements between carriers would qualify an intrastate service as interstate, but never stated that these were the exclusive means to qualify as interstate. In fact, the ICC stated explicitly that "Through ticketing for interstate destinations is one indicia of interstate service." *Id.* at n.1. Likewise, in *Aspen Limousine Service, Inc., v. Colorado Mountain Express, Inc.,* 919 F. Supp. 371, 376 (D. Colo. 1996), the court cited common arrangements and through ticketing as examples of instances where a purely intrastate limousine ride could be interstate, but never addressed whether any other means, such as third party arrangements, could qualify as interstate.

More recently, the Third Circuit in *Packard v. Pittsburgh Transp. Co.,* 418 F. 3d 246 (3d Cir. 2005) concluded that a city bus service for the elderly and disabled, whose transportation to and from an airport was "a very minor part" of its operation, without joint fare or ticketing arrangements and without any third party ticketing, and that had "no strong established cycle of regular passenger movement between the (shuttle) service and particular interstate routes" was not an interstate service. *Id.* at 258. *Packard* did not address a situation like this one, and did not hold that a joint arrangement with an airline or through ticketing were the exclusive means to achieve interstate status.

The only authority the Commission cites that does assert that through ticketing or common arrangements are the exclusive means by which intrastate transportation can be legally interstate is one "informal opinion" from the Federal Highway Administration ("FHWA") and two letters purported to be from the Secretary of Transportation to Congressman Mark Andrews. These putative DOT letters are not on letterhead, are unsigned and undated, and appear to be

drafts. I do not consider these to be evidence of an agency opinion.

The FHWA opinion states that "The ICC has long required the existence of a through ticketing arrangement or other common arrangement with a connecting out of state carrier in order to find that a single state transportation segment was part of an interstate movement." The letter cites *Yellow Cab* and *Pennsylvania Public Utility Commission*, as well as other ICC opinions. This letter, while expressing an agency opinion, is of only limited persuasive value. An agency's interpretation "contained in an opinion letter, not one arrived at after . . . formal adjudication or notice-and-comment rulemaking" are not entitled to the kind of respect normally afforded agency positions that possess the force of law. *Christenson v. Harris County,* 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000). Rather, "interpretations contained in formats such as opinion letters" are entitled to respect only to the extent they are persuasive. *Id.* Moreover, an agency interpretation is especially undeserving of deference when, like here, it is addressing a question of law based on "an interpretation of a judicial decision that in turn construes the Constitution or a statute." *Charter Limousine, Inc. v. Dade County Bd. of County Comm'rs,* 678 F.2d 586, 588 (5th Cir. 1982). Accordingly, since the FHWA opinion merely purports to interpret judicial decisions, it has very little persuasive authority.

Conversely, CME cites several federal court cases finding airport limousine services that lack either a common arrangement with an interstate carrier or through ticketing to nevertheless be interstate. The Eleventh Circuit, in *Executive Town & Country Services, Inc. v. City of Atlanta,* 789 F.2d 1523 (11th Cir. 1986) concluded that the company's limousine service to and from the Atlanta airport qualified as interstate, distinguishing it from the normal intercity taxi service in *Yellow Cab,* because most of its business is prearranged trips to and from the airport.

*Id.* at 1526. In *Charter Limousine,* the 5th Circuit specifically rejected the argument that a common arrangement or through ticketing was necessary to render an airport limousine service interstate in nature, concluding instead that a limousine service's prearranged transportation service – and its absence of random or on call service – was sufficient to render its service interstate. 678 F.2d at 589. (Significantly, the ICC, in the *Funbus* litigation, cited *Charter Limousine* positively, noting that *Charter Limousine* held that "the common arrangement need not necessarily be between the air carrier and the ground carrier."*Funbus,* 1988 WL 225255 at 5, n.1. The Third Circuit, in *Sutherland v. St. Croix Taxicab Ass'n,* 315 F.2d 364, 369 (3rd Cir. 1963) concluded that taxi service from the Virgin Islands airport to other locations in the Virgin Islands was interstate where passengers arranged through a travel agency for a package that included ground travel from the airport to their hotel. The court concluded that the airport taxi service was "an integral part of their all-expense interstate journey," and was not "distinct and separate from the interstate journey." *Id.*

Other authority reinforces CME's argument. *See Airline Car Rental, Inc., v. Shreveport Airport Authority,* 667 F. Supp. 293, 296 (W. D. La. 1986) (Where "a great deal" of an airport limousine's service's operations "are prearranged by interstate communications," it has "alleged facts which, if proven would show that it engages in interstate commerce"); *Airport Taxi Cab Advisory Committee v. City of Atlanta,* 584 F. Supp. 961, 964 (N.D. La., 1986) ("If taxi service or other local ground transportation is prearranged for the interstate travelers, the courts have found the local transportation to be part of the flow of interstate commerce"); *Park 'n Fly of Texas, Inc., v. City of Houston,* 327 F. Supp. 910, 921 (S.D. Tex. 1971) (courtesy buses taking passengers to car rental facilities and parking lots at a municipal airport are in interstate commerce

11

due to their proximity to the airport, and because their customers "are almost exclusively bound for interstate travel" even absent a contract with the airlines. )

I find CME's argument persuasive. The Supreme Court in *Yellow Cab* described interstate commerce as "an intensely practical concept drawn from the normal and accepted course of business." *Yellow Cab,* 332 U.S. at 231. *Yellow Cab* concluded that regular City cab service to or from an airport was not interstate because it was "quite distinct and separate from the interstate journey." *Id.* at 232. Accordingly, I must determine, based on practical considerations, whether the service provided by CME is "distinct and separate" from, or an integral part of, the interstate journey.

I note that the world has changed since the *Yellow Cab* decision in 1947, and even since the *Funbus* litigation of the 1980s. The rise of the internet and the world wide web has spawned a wide array of internet based travel services that allow the interstate traveler to readily book reservations for airline tickets, ground transportation to a ski lodge, accommodations at a ski lodge and lift tickets, or individual components thereof. Some ski-lodges offer package deals with some of these same services. Regardless of the individual components of such services, they serve generally to change the nature of the interstate trip. As a practical matter, an individual arranges an airline ticket, transportation to a lodge and accommodations all as part of a single interstate trip, even where the various pieces are not part of a single reservation. Indeed, the expansion of internet-based travel arrangements prompts the need to rethink needlessly formalistic rules defining interstate travel, and return to the *Yellow Cab* prescription of a practical approach based on common understandings.

In this context, CME's service is, as a practical matter, integrally linked to the interstate

journey. There is no genuine dispute here that passengers traveling from outside of Colorado to a

ski resort do not end their journey at the airport; they end their interstate journey at the resort.

This is not a case where passengers arrive at the airport and, as in *Yellow Cab*, fend for

themselves to get to their next stop in any manner or at any time that suits them. They travel via a

ticket pre-arranged from a third party travel agent or on-line ticketing service, sometimes as part

of a package with the plane ticket or with the resort, on a service that predominantly, if not

exclusively, provides airport transportation. This kind of prearranged system, like that in *Charter

Limousines,* is sufficiently linked to the overall interstate journey to qualify as interstate.

  3.  Substantial in Relation to Intrastate Routes

  To demonstrate that it operates in interstate commerce, CME must show that its interstate

traffic is "substantial" in relation to its intrastate transportation. *Funbus Systems, Inc. - Intrastate

Operations – Petition for Declaratory Order,* Nos. MC-C-10917, MC-153325 (Sub. No. 2), and

MC-C-109543, 1987 WL 100200 at *9 (December 30, 1987).  The Commission contends that

various courts, as well as the ICC, have determined that "substantial" means that interstate service

must comprise 24 to 28 percent of a carrier's overall traffic. *See Collins Coaches Ltd. Common

Carrier Application,* 1990 Fed. Car. Cas. ¶ 37,781 1989 WL 246961 at *1 (decided December 5,

1989).  However, the Commission cites no authority establishing any particular threshold for

"substantial" interstate commerce for these purposes. *Collins Coaches* stated that the 24 to 28

percent range is substantial, but did not offer a general numerical rule or basis defining the

meaning of "substantial" in this context. *Id.*

  CME contends also that Congress in 1987 enacted amendments dropping a prior

requirement that carriers provide "substantial" interstate transportation, and that the new language

states only that carriers using a federal certificate must "provide(s) regularly scheduled interstate transportation service on the route." *Surface Transportation and Uniform Relocation Assistance Act of 1987*, Pub. L. No. 100-17, § 340, 101 Stat. 132 (1987). As evidence of this change in federal policy, CME argues that since 1987 the language on CME's federal certificates, following the change in statute, no longer requires CME to provide substantial interstate service. While the 1987 amendments create some ambiguity, the Tenth Circuit has addressed this issue since 1987, and has continued to apply the "substantial" requirement for interstate service, even after citing the amended statutory language. *See Airporter,* 866 F. 2d at 1240-1241. Based on this Tenth Circuit precedent, I conclude that despite the 1987 amendments, a carrier must still demonstrate "substantial" interstate service.

CME contends that it meets this requirement. CME has produced a traffic study showing that in 2003 approximately 63,394 passengers used its service as part of pre-arranged trips through third parties, while approximately 199,503 of its passengers were "walk-up" passengers, who either made no advance arrangements or made them only through CME itself. CME concedes that these passengers, even though using CME to complete an interstate journey, are intrastate passengers for the purposes at issue here. Assuming these figures to be correct, and the Commission does not dispute that these figures represent the proper ratio of CME's prearranged passengers to its walk-up passengers, this means that 24.1% of CME's overall service was interstate, satisfying even the numerical criteria argued by the Commission.

The Commission does challenge CME's analysis on other grounds. Dino Ioannides, an official of the Commission, independently analyzed the studies and data CME provided, and concluded, in a Verified Statement, that in fact only 14.8% of CME's scheduled passengers

14

traveled in interstate commerce in 2003. (The Commission also provided a "Confidential

Supplement of Counsel" to the Ioannides statement which modifies Ioannides' conclusions and

asserts that in fact only 13.7% of CME's passengers traveled in interstate commerce. Using a

statement of counsel to supplement or modify a witness statement is, to say the least, irregular.

However, the difference between the two figures is irrelevant to the dispute here, so I will not

address the validity of this purported supplement to Ioannides' statement.)

The principal basis for the Commission's critique stems from a legal assumption. The

Commission contends that only CME service that is part of a third party package that includes

an airline ticket qualifies as interstate transportation, while a package consisting "only of CME

ground transportation and lodging does not result in the transportation of that passenger in

interstate commerce."  As discussed above, I reject this legal conclusion. Accordingly, the

Commission's painstaking demonstration that a substantial number of the trips CME regards as

interstate were not part of a package that included an airline ticket is unavailing. The Commission

does not dispute that the 24.1% figure accurately reflects the number of CME's pre-arranged trips

to or from an airport in 2003. Nor does it dispute that these trips were an intrastate component of

an interstate journey.  I conclude that CME has met its burden to show that it engages in

substantial interstate transportation.

B.    Does the Commission Enforcement Action Fall Under the "Notice" Exception

The Commission argues additionally that even if CME is engaged in interstate

transportation, the enforcement action that is the immediate subject of this litigation is not subject

to federal pre-emption. The federal law in place in 2003 specifically bars states and their

subdivisions from enacting or enforcing any law relating to "scheduling of interstate or intrastate

transportation (including discontinuance or reduction in the level of service) provided by a motor carrier of passengers subject to jurisdiction under subchapter I of chapter 135 of this title on an interstate route," 49 U.S.C. § 14501(a)(1)(A) (2003); and "the implementation of any change in the rates of such transportation or for any charter transportation  except to the extent that notice, not in excess of 30 days, of changes in schedules may be required." 49 U.S.C. §14501(a)(1)(B) (2003).

The Commission contends that its CPAN against CME falls under this exception for 30 day notice of changes in schedule. The Commission's CPAN cites CME for 16 separate violations of Col. Rev. Stat. § 40-10-117, which prohibits carriers "from carry(ing) or advertis(ing) that it will carry any persons at rates different from those it has on file with the commission for such carriage." The language of the CPAN follows the statutory language, citing CME for "carrying and advertising to carry persons at rates different from those on file with the Commission."  The Commission argues that its CPAN alleges that CME, in effect, failed to provide notice to the commission of its rate change. The Commission provides a verified statement by Gary Gramlick, the Commission official who investigated CME and issued the CPAN. Gramlick states that he intended only to support the CPAN with evidence of CME <u>advertising</u> at rates different from those on file, not with <u>charging</u> rates different from those on file. Since the CPAN did not in fact penalize CME for the substance of its rate structure, but only about the advertising of a rate structure, the Commission argues its action  is not preempted by federal law.

This argument is unconvincing, for several reasons. First, the penalty notice states explicitly that CME is cited for "carrying <u>and </u>advertising to carry persons at rates different from those on file with the Commission." (Emphasis added.) Gramlick's statement, made in September

of 2005, that he did not intend to pursue the "carrying" prong of the CPAN does not alter the

plain language of the CPAN.  While the Commission contends that its witness and exhibit list for

its enforcement action states clearly that Gramlick will testify only about CME's advertised rates,

the full sentence the Commission itself identifies in its brief reads as follows:

> "Mr. Gramlick is expected to testify about Staff's investigation
> of (CME's) advertised passenger transportation rates for scheduled
> service on September 29-30, 2003, (CME's) Commission-approved
> tariff, and Staff's issuance of Civil Penalty Notice No. 28339-CPAN
> to (CME)."

Contrary to showing that the enforcement action is limited to advertised rates, this shows that the

Commission intended to also address CME's approved tariff.

Second, neither the CPAN itself, nor Gramlick's statement ever specifically cites CME for

failing to provide 30-days notice to the Commission of CME's rate change. At the very least, the

CPAN seeks to penalize CME for advertising rates different from those on file with the

Commission. While under certain circumstances this might end up being the practical equivalent

of a notice requirement, the Commission has not provided evidence that an explicit notice

requirement exists, or that CME has violated it.

Finally, the exception in § 14501(a)(1)(B) refers explicitly to changes in schedules, while

both the CPAN and the Colorado statute refer to "rates." Section 14501(a)(1)(B)  refers in the

same sentence to rates, apparently distinguishing rates from schedules. It is unclear whether the

federal statutory term "schedules" here refers to a transportation schedule or a schedule of rates,

but it is quite clear that the CPAN did not address CME's proposed schedule. On this basis alone,

the CPAN does not appear to fall under the exemption for notice of changes in schedule.

Accordingly, I conclude that the CPAN does not fall under the notice of schedule changes

exception contained in § 14501(a)(1)(B).

C.      Are CME's Routes from Eagle Airport Necessarily Subject to Incidental to Air Authority?

The Commission argues that all of CME's traffic from Eagle Airport must operate under

incidental to air authority, 49 U.S.C.§ 13506(a)(8)(A). As discussed above, this provision

exempts from ICC regulation ground transportation within 25 miles of an airport. Also, where this

kind of transportation is provided pursuant to a common arrangement with an air carrier and a

through ticket, it is considered "interstate" transportation and is also outside of the regulatory

reach of state agencies, like the Commission. *See Kimball,* 131 M.C.C. at 916.

The Commission contends that despite CME's federal certificates for routes that enable it

to service Eagle airport, because CME's Eagle Airport service consists largely of trips of 25 miles

or less, and because it operates these routes independent of its DIA routes, it must rely on

incidental air authority and may not operate these routes pursuant to its  federal certificates. Since

CME lacks through ticketing provided by the airlines, under incidental to air authority its activities

are not interstate, and it would fall under the regulatory authority of the Commission.

I find this argument unpersuasive.  The Commission does not explain how CME can be

forced to rely on the incident to air exemption when it has a federal certificate to use these

routes.. In effect, the Commission urges me to conclude that because CME runs its operation in

such a way that it might have claimed incident to air status, and had it made this claim it would

have failed and thus been subject to state regulation, I should ignore its federal certificates and

require it to claim a status for which it likely does not qualify in order to confer state oversight. I

decline to do so.

D.      Has CME Made out a Claim Cognizable under Section 1983?

18

The Commission contends that CME, even if it prevails in its other arguments, cannot overcome the heavy burden of proof imposed by 42 U.S.C. § 1983. Citing *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001), the Commission argues that CME must show that the Commission violated CME's constitutional or statutory right, and that the right was clearly established at the time. The Commission avers that CME cannot pass the first prong of this test, because 49 U.S.C. § 14501 does not create an enforceable federal right under 42 U.S.C. § 1983. *See Loyal Tire & Auto Center, Inc. v. Town of Woodbury,* 445 F.3d 136, 150 (2nd Cir 2006).

However, CME brings this § 1983 action to enforce its claim under the Commerce Clause of the U.S. Constitution, not under § 14501.  There is no question that rights under the Commerce Clause may be enforced under § 1983. *Dennis v. Higgins,* 498 U.S. 439, 442, 111 S. Ct. 865, 112 L. Ed. 2d 969 (1991).  Moreover, the two-part test the Commission describes applies only to a plaintiff's burden in overcoming a defense of qualified immunity in a suit for damages under § 1983. *See Medina,* 252 F.3d at 1127-1128.  Here, CME seeks only declaratory and injunctive relief. Qualified immunity is not at issue and the two-part test the Commission cites is inapplicable.  CME's claim is valid under 42 U.S.C. § 1983.

E.     Injunctive Relief

The Commission asserts that even if CME prevails on some of its claims, this court should deny the injunctive relief it seeks. To obtain a permanent injunction, a party must show: "(1) actual success on the merits, (2) irreparable harm unless injunction is issued, (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Fisher v. Oklahoma Health Care Authority,* 335 F.3d 1175, 1180 (10th Cir. 2003). The Commission argues that CME cannot

meet the last two prongs of this test, because injunctive relief would place CME outside of the Commission's regulatory jurisdiction and because no agency, state or federal, would be able to effectively oversee CME's operations. I disagree.

CME is outside of the Commission's jurisdiction because it is subject to federal regulatory oversight based on a Congressional statutory scheme. Subjecting a carrier like CME to federal, rather than state, regulation neither harms the Commission nor is injurious to the public interest. CME is entitled to injunctive relief.

F.    Attorney Fees

The Commission, citing *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992), contends that even if CME prevails in this dispute, it does not necessarily receive attorney fees under 42 U.S.C. § 1988. Again, I disagree. *Farrar* held that a party is only eligible for attorney fees if he prevails on the merits of his case. *Id.* at 109. This in turn involves succeeding on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.*  Put differently, "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111-112. *Farrar* went on to state that the nature of the plaintiff's success on the merits is related to the amount of attorney fees a successful plaintiff may claim. *Id.* at 114.

I therefore conclude that based on the disposition of the claims in this Order, CME is a prevailing party and is eligible for attorney fees. I do not address here the amount of attorney fees to which CME is eligible.

It is so Ordered that the defendant's Motion for Summary Judgment (Docket # 80) is DENIED, and plaintiff's motion for summary Judgment (Docket # 77) is GRANTED, in that,

1)      this Court declares that the Commission is without jurisdiction to regulate CME's transportation over its federally authorized routes, and

2)      the Commission's attempt to enforce its CPAN against CME has violated CME's rights under the Commerce Clause, Article I, § 8 of the Unites States Constitution, pursuant to 42 U.S.C. § 1983, and

3)      the Commission is permanently enjoined from regulating CME's operations on its certified federal routes, and the enforcement proceeding pending before the Commission is DISMISSED, with prejudice, and

4)      CME is awarded attorney fees and costs pursuant to 42 U.S.C. § 1988.  CME shall submit its detailed statement of fees and costs within 20 days from the date of this Order and the Commission shall respond within 10 days of the submittal.

**DONE and ORDERED,** this ___5th___ day of July, 2007, at Denver, Colorado.

___s/Lewis T. Babcock_____
United States District Judge